Case number 21-5166, Loper Bright Enterprises, Inc, et al. Appellants, Cape Trawlers, Inc, et al. versus Gina Raimondo in her official capacity as Secretary of Commerce, et al. Mr. Bolander for the appellants, Mr. Herlion for the appellants. Good morning, Your Honor. Good morning. May it please the Court. Eric Bolander for all appellants. This case rests on a simple question. Does the government have statutory authority to impose industry-funded monitoring on the New England herring fishery? Is there a simple answer? It does not. And Congress spoke clearly. So why don't we talk about that? Yes, Your Honor. So first, the statute doesn't contain any grant of authority explicit or implied to shift the this Court should learn from Congress here is that the statute does explicitly grant the government the authority to shift monitoring costs onto fishermen in three specific instances, the North Pacific fishery, limited access privilege programs, and foreign fisheries, none of which apply here. And this paints a clear picture. Congress never intended to grant this extraordinary authority to the government beyond these three fisheries. So let me ask you, just generally, what do you do with respect to the context here that Congress knew this was an industry-funded operation? Ah, with regards to the legislative history, when Congress gave the authority? No, no, just a fact. In other words, Congress, this isn't the first time Congress addressed this issue. In the, I think it's the first time Congress when the North Pacific fishery was authorized. There was a lot of comment in the legislative history about whether or not NOAA had or the government, I should say the government had the authority to impose industry-funded monitoring. And I think it's very unclear that the government had that pre-existing authority. And of course, I would argue that it did not have that pre-existing authority. But Congress knew, and you can answer my question or not, that it was industry-funded. But it didn't change that. And I just want to understand when the Supreme Court has spoken to say context is relevant, what your response here is. Yes, Your Honor. I think, I mean, I think it really points to our side of the case. If assuming Congress knew that the North Pacific fishery was already using the industry-funded monitoring before it passed 1853 B-8, which is where the government claims authority here. Then by speaking clearly and saying, okay, we're going to put in and codify explicit industry-funded monitoring authority to the North Pacific fishery and the North Pacific fishery alone. And the same statute that it implemented B-8 shows that Congress clearly only wanted this statutory authority to apply to the North Pacific fishery. Or Mr. Bolander, it could mean that Congress wanted each region to have the ability to make the decision. That it was focusing specifically on the plan that had been put before it with respect to that council and that region. But it wasn't necessarily speaking to whether or not any other council could make that decision. Why isn't that a reasonable way to interpret the history? Well, I think if we, if we apply the canon of the specific governing the general here, we have a general authority that the government claims under section B-8, and then we have a specific authority in these three fisheries. I thought you were talking about the history and what we could glean from the fact that Congress did or did not amend the statute to talk about other areas as opposed to New England. Well, I would submit that in the history, Congress was very concerned about the contours of this authority. Like I said, this is an extraordinary authority that has an enormous, and I think the record reflects, has an enormous economic impact on the fishermen. So at that time, Congress looked and saw and said, okay, the North Pacific fishery, perhaps unlawfully, was using industry funded monitoring. We want to codify that, but we want to limit it to that specific fishery. If Congress wanted to give this authority to all the other fisheries, why did it not do that in B-8? And I would point, earlier in 1853 section B, under subsection one, it gives authority to charge fees for permits. So even for something as simple as a permit, Congress thought it necessary to say, okay, you can charge fees for that. But in 1853 B-8, Congress is silent, whereas elsewhere in the statute, it delegated this specific authority. And I think if you look at the legislative history as well, in the time that's elapsed since then, Congress has continually considered whether or grant this authority broadly to all the other fisheries and has declined to do so to this point. So what about the provisions that Congress did require be taken into account? Namely, the economic impact that any charges should be minimized. I think, so that would go more to the analysis of whether or not the agency considered cost. And I think, again, our point would be that the agency has no regulatory authority here at all. But if we are going to go into the consideration of cost, if you look in the record, you'll see in our viewpoint is that the agency failed to consider cost appropriately, which is something- Well, that's a different issue. We're still on this context and what Congress did do. And I think, again, I'm just asking you to consider this alternative way of looking at it, that Congress had made some general, reached some general conclusions. Now it had to apply it to this specific region, would this council have to do something different? And instead, Congress didn't change that. It simply said, in these very specific provisions that we've discussing, look at cost. So you say they did consider cost and decided to go forth as they have. So isn't Congress, I mean, why would Congress even put those provisions in the statute if there was a question in Congress's mind? I think there was, so two answers to that, Your Honor. I think first, there was a question in Congress's mind of whether the fisheries had this authority at all, before the authority was given to the North Pacific fishery. That's not my question, is it? Council, I know the general arguments here, but I'm trying to be very specific, so I understand. Your question, just to make sure I understand your question correctly, you mean about the Congress's charge to the fisheries that they consider, or to the government that they consider cost? Yes, and you acknowledge the government did consider cost. But Congress didn't say you have no authority to impose these costs, rather the government has to pay for them. I think, and so I think the Congress gave authority to impose these costs in these three fisheries. I think Congress, it would require Congress to sort of play, to use the terminology we use in our brief, whack-a-mole, if it were to say that. What's the word? Whack-a-mole. Yeah. I didn't understand it when I read it in your brief. What does it mean? Thank you, Your Honor. It means that Congress would need to go through and say to the agency, here is every single thing you cannot do. And that's not the way administrative delegations of authority are supposed to work. I understand that, but the point is the Supreme Court has acknowledged that context matters. And that's what I think Judge Jackson's questions and my questions were trying to get you to focus on. I mean, there are all these principles you cite in your brief, and we understand those. That's not the issue, in my view. So I'm trying to understand why these other arguments are not persuasive. And you're saying, well, it did it in three circumstances, and government says, well, it's very different circumstances. And there's nothing to indicate that Congress intended to limit the agency here. I believe that by applying the canons, I believe, and if you look at costs, right? So when Congress delegated this authority to the government to impose these costs on fishermen, they were very careful in doing it. And looking at the legislative history, this is something that was debated and discussed. Looking at the specific programs, such as the limited access privilege program, there's caps on the amount of costs that can be imposed on the industry. There's a geographic, and there's a class of fishermen scope. So I think Congress was very cognizant of the cost that was imposed on the industry. No question about it. And it put this burden on the agency to consider costs. But it didn't say, either directly or indirectly, in the context of what had been going on. And I understand, we have to look at what Congress has authorized, not what Congress has said you can't do. But here, why would Congress have added these provisions, if it intended not to have the observers be industry funded? I think Congress intended for observers to be industry funded in only these three specific circumstances. But why then would it put the other provisions in? That's what I'm asking. So those are just under your argument, surplusage. Yeah, I believe so. Section B-8 doesn't speak, the 1853 B-8, which is where the government claims authority here, doesn't say anything about shifting costs. All it authorizes- Mr. Bolander, doesn't that hurt you? I mean, this is precisely what Judge Rogers is saying. It, B-8 allows for these plans to require that one or more observers be carried on board the vessel. And it doesn't say, and the government has to pay for it, or you can't shift the cost to the industry. So to me, the silence could mean that Congress contemplated that the agency would take into account costs, as Judge Rogers points out, and as reasonable, as necessary, as the agency thought appropriate, it could authorize a plan that shifts the costs. Congress doesn't prohibit it. And against the backdrop of what you're saying, that there is real serious concern in Congress, you would think they would have said, don't shift the costs. Your Honor, I think the government's argument, and I understand what you're saying, is that it doesn't say in there that you can't do it. And our response would be that when for an agency to act, it needs a delegated authority from Congress. So here, it's not the fishermen that need to show that we do or do not have congressional delegation of authority. It's on the agency. Can that delegation be implicit? Must it be explicit? And why isn't the language in B-8 saying specifically speaking to the issue of observers being required to be placed on vessels? Why doesn't that carry with it an implicit authority to make a determination regarding who pays for that? First of all, it's an extraordinary authority to place. I mean, this is not your typical compliance costs that you would think about. It's a human, it's an intrusive observer, it's someone that's on your boat that watches you fish, that sleeps in a bunk. This is not like the type of net that you need to use. And also, the cost is significant. And I would say that by delegating this authority explicitly in three other fisheries, and I know I'm repeating myself here, Congress showed that this sort of extraordinary authority, this sort of extraordinary intrusion on the fishermen, including the extraordinary inclusion of cost, is something that Congress needed to specifically delegate. And by speaking- So your argument is the three specific provisions and the argument. Your Honor, that is our point. We have other arguments, but our primary argument- I don't know, but a lot of them are canons and that sort of thing. And we've been trying to examine that even though you're resisting answering the questions, and I understand that. But I just want to be clear, it's the three provisions. That's the three provisions- That's your strongest argument? Yes, Your Honor. Well, the strongest argument, I think, is that there's silence. There's silence in the statute. There's nothing that says that Congress can have this general authority over the New England herring fishery. And what supplements that argument is the fact that Congress thought it necessary, thought it required, to grant this specific power to these other three fisheries, the North Pacific- Mr. Bolander, are you arguing that the New England fishery is not subject to VA in terms of authorization to have the observers be required in any event? I mean, I thought this was just about who paid. That's right. That's correct, Your Honor. I'm not arguing that. All the rhetoric about this is intrusive to have observers on the boat, you accept that there is authority in the statute to have observers on the boat? Yes, Your Honor. All right. So this is just about the payment. And so what I'm trying to understand is how you're separating that out. Why we see a statute where Congress clearly says, observers on the boat, do it. You can do it. You may have it. We're authorizing that. And they don't speak specifically to cost. But there are lots of statutes in which Congress authorizes action. And every one doesn't have a line item with respect to what the agency can do about cost. So why is it that you're suggesting that the language that they use here, which absolutely authorizes this kind of conduct, is not sufficient to be an implicit grant of authority to the agency to determine who pays? Your Honor, I have a two-part answer for that. The first, I've already gone through it. I'm not going to repeat myself. It's that the specific would govern the general here and that you don't need to consider the difference between this and other compliance costs. But if the court were to reach that, first, what I've already said about it being the human intrusive observer, I'm not challenging the authority under B-8, like you said, Your Honor, for them to place the observers. But what I am saying is that this is not like a compliance cost that you see elsewhere. So I mean, they have to- No, you say that, but you've got to be more specific. That's what we're trying to get at here. Your Honor, I think we cite in our brief a few other statutes and a few other cases. We cite engine manufacturers, the EPA- Right, and the government distinguishes those cases. And I think also here, so again, I think we look at it, we see that kind of the human observer and investigator is something that Congress has distinguished in the past. And also the cost of this is entirely inconsistent with what you would normally see as the compliance cost. The government- Isn't the cost split as a factual matter? I just want to be clear on this. It's not that the entirety of the cost of having these folks on the boat is shifted to the industry. Isn't the agency sharing it with the industry? To an extent, yes. So as the agency will put it, sort of governmental functions like training and other stuff that's sort of on the shore side, again, in our view, they're all governmental functions. And what the fishermen have to pay for is basically the salary and the cost of the monitor to ride the boat. So yes, there is a cost sharing implicit in that, but the cost on the fishermen is $710, an average of $710 per day, regardless of what the government captures on the other side or not. So the fishermen are always going to be on the hook for that amount of money, which is extremely excessive when compared to any other compliance costs. And it's really distinct from any other compliance costs, which might be incidental to fishing. For example, if you have to have ecologically friendly nets, you need to have nets to fish anyways. And if you compare the cost, the government talks about the vessel monitoring system. As we've seen in the government's rulemaking in a different fishery, the cost there is a one-time upfront cost with a very low monthly cost, which is very distinct from the cost here, which is a constant per day. If we disagree with your Chevron step zero, step one arguments, and we're in the world of this statute is ambiguous and the agency is now interpreting it, what's your best argument for the agency's interpretation of the scope of its authority in this area being unreasonable, given all of the things that you're now saying? I think our arguments, I mean, again, on Chevron step two, we don't just assume that the agency has the statute right. And I think it's an impermissible construction because again, I think the canons speak clearly to this. I think the failure to consider costs was arbitrary and capricious. I think the agency's ignorance of sort of- Wait a minute, wait a minute, wait a minute. Let's just be clear. I understand canons, but then you said the agency's failure to consider costs. You previously told us and acknowledged that the agency had considered costs. The agency's failure to consider costs in this implementing regulation. The agency is mandated by Congress to consider costs. And it did. That's what I'm getting at. The statute told it to, and it did. You admitted that. The statute- What else other than you think it's an impermissible interpretation? Other than an impermissible interpretation under Chevron step two, again, I think there was a little confusion in the briefs. It's not that the agency can't impose costs at all. It's that the agency adequately has to consider costs and alternatives. And our view is that when the agency ran through the monitoring alternatives, it looked at a few different numbers, 100% coverage, 50% coverage, and it landed on 50% coverage. It did not appropriately consider the impact that would have on the fisheries. National standards seven and eight under the Magnuson- How do you know that? You just told us they did consider costs on your clients. They need to adequately consider costs, Your Honor. All right. And so you said, what, they didn't consider enough alternatives? We don't believe they explained their alternatives appropriately and the impact- Oh, failure to explain appropriately. Okay. So- Even though they said we look at all these alternatives? I think they need to consider the future, the impact this would have on the future of the fishery. I mean, if you look in the record, there was an indication and it did happen that there would be a 70% cut in quota in 2019 on the herring fishery. This is on top. So quota is like how much fish they're allowed to catch. And that's under a different provision of the statute. That's a different issue, isn't it? A quota on the number of type of fish you can catch. Your Honor, it's implicated- There's no suggestion the agency wasn't aware of that. No, I mean, the agency was aware of it, and in our view, failed to consider the economic integrity of the fishery going forward. $710 a day, and there are commenters that said this as part of the record is potentially ruinous to the fishery. You combine that with the 70% cut in herring quota reduction, which was anticipated and did happen in 2019, and you have a $710 per day charge on top of that. Do we have any declarations that this is devastating to your clients and they'll go out of business? Our clients have not submitted a declaration to that. Yes, so that's just speculation on your part. There's nothing before the court, and I don't know what there was before the agency because you haven't cited it. Other than failure to explain appropriately and your failure to consider the future of the fisheries as a result of this 70% reduction, what else? I just make a very brief point, Your Honor, in the comments. It's not a declaration, but in the comments, our client did raise what a 70% quota might impact their business. So the agency was aware of that? Then our view is that the agency adequately failed to consider that. What would they have to do that they didn't do? I think they would need to honestly assess the future of the fishery, whether or not the fishery would go bankrupt, whether or not- Well, you said there were no affidavits, none before us, about bankruptcy looming. Your Honor, I just believe that the comments paint a picture of that possibility and that the agency needed to adequately consider that possibility. All right. Anything further? Your Honor, one other point we made in our briefing is that the agency pre-judged the omnibus amendment. Obviously, this is an alternative argument to our primary argument that there was no statutory authority here at all. You got to think about it as the omnibus amendment, an analogy is it's sort of like Congress passing a statute, and then the regulation is the implementing regulation. Our view is that the comment period was open, the omnibus amendment was still being- So the I should say evaluated as legality by the government, but in that time period, before the government had made a final decision on the legality of the omnibus amendment, it proposed the implementing regulations that would put this on the fishery. In our view, that is proof that the government pre-judged the legality of the omnibus amendment. The government needs to consider comments, not just as a matter of grace, but give them serious consideration, and we think the government failed to do that here. We believe there's an issue of pre-judgment on this as well. Great. All right. Thank you. Let us hear from the police. Good morning, your honors, and may it please the court. My name is Daniel Helinen for the government in this matter. So in section 1853 B8, Congress authorized the National Marine Fishery Service to adopt requirements in fishery- to approve the requirements in fishery management plans that include the requirement to carry observers on industry vessels participating in these highly regulated fisheries, and that's exactly what the agency did in approving the omnibus amendment here and in adopting the implementing regulations. In section 1853 B8, Congress authorized the agency to impose these requirements, and without limitation, based off of funding or anything like that, as has been discussed this morning, you know, there's nothing in the statute itself that addresses funding, and the normal default assumption when the government is authorized to impose regulatory requirements like this is that the industry vessel may be required to bear the cost of compliance, and that's exactly how this rule works. And what do you cite for that? What's your strongest normal default? So I think within the context of the Magnuson-Stevens Act, you just have to look at things like National Standards 7 and 8, which directly address, you know, Congress's intention for the agency to consider compliance costs for provisions that are adopted in fishery management plans under section 1853. You can look at other provisions that Congress directly authorized the agency to adopt in fishery management plans, and for example, section 1853 B4, that would naturally impose compliance costs. What is missing... I'm sorry, please finish your sentence. What is missing here is any statutory limitation in section 1853 B8 that would suggest that this type of requirement should be treated any different from any of the many other requirements in the fishery management plans that are a condition for, you know, participation by industry vessels in these highly regulated fisheries where, you know, compliance costs will normally fall on the industry vessel. Well, appellants, it seems to me, make some strong arguments about how the and regardless of whether Congress says anything about it, and see all the EPA cases, and furthermore, we have said repeatedly that agencies are creatures of the authorization by Congress. And so now we have these three provisions where Congress is very specific, and I'm just thinking of the arguments that will be presented here in terms of Congress could have made this clearer, it never did, and so that's why I started my questions out with what about the context here? And you heard counsel for appellant. Do you want to respond specifically to any of those arguments above and beyond what you stated in your brief? So I think looking at the statutory context, it's important to recognize in that in section 1858 G1D, and this is part of our briefing, that Congress expressly contemplated that in implementing observer requirements, industry vessels would, under certain circumstances, be required to procure observers at their own expense. And you can see that in section 1858 G1D because that provision authorizes sanctions where a vessel fails to peg observer service for contracted for services. But why couldn't those sanctions be relevant to only those three circumstances in which it's clear that Congress has contemplated fees? I mean, it seems to me that I don't know that I can take much from this sanctions provision in terms of the authorization to require fees to be shifted up front to begin with. Yes, Your Honor. So I think this gets at the important distinction between a fishery management plan, which is just imposing, you know, a number of different requirements on industry vessels, and a dedicated program funded by fees that Congress has established specifically by legislation. So the way that the fee programs work that plaintiffs are relying on here is Congress has authorized the collection of fees generally among participants in those programs that are paid directly into the United States Treasury to allow the government to recover the costs of providing observers directly. So that is why plaintiffs' reliance on the fee programs to explain the provision that I'm referring to in section 1858 doesn't make sense because under those fee programs, the United States Treasury is providing the observer directly. So there's no need for the... That's not true for foreign fishing, correct? Isn't that not always true for foreign fishing? Sometimes the observers are paid directly by the fishermen. I believe Your Honor is referring to section 1821 H6. So I want to first situate foreign fishing generally. Under the general foreign fishing program, this is section 1821 H1. That is a fee program along the lines of what I've just described. Congress authorized the collection of fees, actually in that case mandated the collection of fees from foreign fishing vessels to fund the government provision of observers and to permit the government to recover the costs from that. There is a specific provision in 1821 H6 that plaintiffs I think have relied on, which is addressing a supplementary foreign fishing observer program, which is an exception to the general rule of how the foreign fishing works. The sanctions provision could be referring to the exception to the general rule. So that's not correct, Your Honor, for a few different reasons. The first is that interpreting the sanctions provision as referring to this particular sort of exception in the foreign text of section 1858 G1D and other provisions of the statute. So if you look at 1858 G, it is referring generally to any payment required for observer services provided to or contracted by an owner or operator who's been issued a permit under any marine resource law administered by the Secretary. So this is a general provision that applies generally to observers under the Magnuson-Stevens Act. And the Congress specifically chose language in that provision that applies generally to any type of observer, including the types that we're talking about here under 1853 B8 fishery management plans. So why not the fee-based program? My only point is why doesn't this capture the three programs that appellants are pointing to? So in general, it doesn't capture those three programs because in a fee program, the vessel is not contracting with an observer service provider. So this reference in 1858 G1D says payments required for observer services provided to or contracted by an owner or operator of a vessel. If they're in a fee program, the government's providing the observer and placing them- Right, that's the first part of the sentence, observer services provided to or contracted by. So why isn't it capturing the provided to by the government? So I think our point is that looking to the fee provisions only cannot explain the contracted to part of that sentence. So under plaintiff's vision of how the statute works, that contracted to part isn't doing any work because the vessels would be provided with an observer pursuant to a fee-funding mechanism. And our point is- You're saying the contracted to, you don't think that could refer to what Judge Walker was talking about, this sort of exception. Here we have a situation in which there are- Are there other circumstances in which observers are contracted in this realm? You say this is a general provision that applies sanctions across the board for observers. And I would think to the extent that any of them involve contracting, why doesn't this just apply to that? It doesn't tell us anything about whether Congress intended for the secretary and other circumstances to authorize fee shifting or cost shifting. Yes, Your Honor. So I have a couple of points to address to that. So our basic point is that Congress clearly conceived of authority in the agency to require observer coverage that may incur costs for the vessel. That's our point about why that contracted for language is in there, that it implies that there is authority somewhere in the statute to require that type of arrangement. Plaintiffs respond by pointing to these three fee programs. And our point is simply that those three fee programs generally cannot explain the contracted by language because in those circumstances, the authority is for the government to provide pursuant to a fee program and observer. I think the specific provision that Judge Walker is referring to requires a little bit more explanation, but I just wanted to say sort of generally, those three fee programs can't account for the contracted by language. Now, as to this supplementary observer program, which is sort of an exception from how the foreign fishing authorization works generally, my point here is that, so first of all, if 1858 G1D's contracted by language was specifically about the foreign fishing program, that's just sort of an odd way to draft the statute in that this is a sort of exception, a supplementary observer rule. The second is that when you actually look at section 1821 H6, it's not actually addressing contractual relationships. It's specifically referring to authority in the agency to so this isn't talking about sort of contractual relationships where you're incurring costs pursuing an observer coverage requirement, which is what's at issue in the rule before the court today. That's simply directing the government about a procedure to follow in the event that there's insufficient appropriations to fund the foreign fishing observer program. So I think that's it. Well, let me kind of zoom out for a minute. Mr. Bollender, in addition to his expressio unius argument, emphasized the silence here and your response seems to be, well, this is just sort of a normal default. And to me, that is kind of the heart of the case, not even so much the expressio unius. But when Congress is silent in a situation like this, is the agency doing the kind of filling in the details that normally happens or is this something pretty weird? And here's why it seems pretty weird to me. These monitors seem somewhat analogous to inspectors. And so, you know, I'm curious if you can speak to other contexts, other situations where the agency is sending around inspectors and the regulated parties basically pay the salaries of the agency employees. And so I have a follow-up question, but that's my first question. So I guess just initially, I would clarify that this isn't a situation where under the rule that we're talking about here, we're talking about government officials, government observers, inspectors being paid for by the vessel. What happens is that they're subject to an observer coverage requirement, and then they are responsible for procuring an observer from an observer service provider. Those observer service providers are certified by the government, trained by the government, but it's simply a private party that they're entering into a contractual relationship. I get that they are technically, you know, private parties, not technically government employees. I'm just saying it seems weird that these private parties who are basically doing the government's inspection work are being funded by the regulated entities. So I think just as a basic proposition, there's nothing in the text that can be included in a fishery management plan, but more directly to your point, Your Honor, I don't think it's unusual in general for regulated entities subject to requirements like this one to, you know, have an observer that collects the information that's necessary under the statute for the conservation of the fishery, which is to their benefit, I should note. Mr. Halligan, sorry, I'm sorry. Please go ahead. Finish your answer. Can we just get the answer first? So I don't think it's unusual when a private party is subject to a requirement like this, for example, something like a licensure requirement, or you maybe need to have an, you know, have auditing done, something like that, that in order to comply with a regulatory requirement that you might need to engage a private party to help you meet compliance standards. So I don't think this is unusual in any way. And there's nothing in the statute that here would suggest that this is a situation equivalent to something like, you know, an inspector along the lines that you're talking about, where it's, you know, funding a government official to provide inspections, it's simply about, you know, the vessel has to participate in this, if they want to participate in the fishery, has to, you know, satisfy these requirements that the agency imposes for collection of information, which is, you know, a central purpose of the Magnuson-Stevens Act. And that is done through... Let me ask one hypothetical, and then I'll get out of the way. Imagine that Congress just defunded the service, the fishery service, defunded the whole agency. Do you think that the agency could then impose enough fee, impose fees on the fishermen and fund the whole service through fees paid by the fishermen? Through a fee program like the three that plaintiffs are referring to? Just, do you think there's any way around, do you think that it's conceivable that there's any way around a congressional decision to defund the fisheries? So I think I have two answers. It depends on the context. So first, for a fee program, I think the collection of fees involves and can implicate other legal authorities, because there are certain things that govern, you know, when the government collects funds that are paid into the revenue, the revenue that's paid into the treasury. So I think to the question whether the government could collect fees, I think that would be governed by whether there's sufficient, you know, legislative authority for that. And I don't think it's necessarily bearing on this type of program. In the program that we have here, I think the rule that the agency actually adopted is illustrative in what would happen in that situation. Because unlike a fee program, the rule that we're talking about here does not involve cost recovery for the government. So the government in administering an observer program will incur the types of costs that I think Judge Jackson was talking about earlier, which is, you know, training, certification, data processing, things like that. The government has to have sufficient appropriations to administer the program. And so the rule at issue here specifically talks about how when there aren't sufficient appropriations to fund the administration of the program, you know, the observer coverage targets are no longer at 50%, essentially, because there's no requirement to comply with an observer coverage target for the industry. And that's because the industry in complying with the observer requirement is paying for sampling costs. So those are the costs of the observer, not the government costs. So they're paying, you know, the cost of complying with the regulatory requirement, and not recovering the government's costs. And I think that helps explain why Congress in certain circumstances adopts fee programs, because those enable the government to recover its own costs. Here, that's not what's happening. So in the event that there were insufficient appropriations, under the rule that we have here, there would be implications for the ability of the government to administer the program. Mr. Helland, and I was going back to Judge Walker's question about the sort of oddity of shifting costs to the industry for its own compliance. I was thinking about this similarly to some other environmental regulations dealing with vessels, the kinds of, you know, dumping scenarios where there are statutes that require vessels to have observers to prevent those kinds of environmental violations. And sometimes, even when the vessels are in, if they suspect that there's been some kind of a violation, the government will enter an agreement with the vessel owner to have them cover some of the costs of the investigation. Am I wrong in thinking about it? It's sort of the idea, I think, is that in this particular context, for sure, it is very hard to monitor and to know that these ship owners are not catching too many fish or not dumping, you know, toxic waste into the ocean or whatnot. And so there has to be some sort of monitoring program. At least that's what the statutes indicate. And that here, Congress seems aware of not only the need, they say that it can be required. And it's not unusual in this kind of case, a circumstance involving ships and vessels and compliance for the costs to be borne in part by the vessel. Am I wrong about that sort of backdrop thought related to this context? I think that's right, Your Honor. I think when you look at the types of programs that we have here generally, for example, in regulating the fishery, there's going to be a lot of information requirements. There's a lot of information needed for purposes of conservation and management. That is a central, you know, aspect of why Congress adopted the Magnuson-Stevens Act. You just have to look at Section 1801. There's all these findings and policy enacted there that goes directly to this point. And so it is natural for the agency under, you know, this delegated congressional authority to adopt a policy towards that end. And it is, you know, I think in the way that you're describing, Your Honor, you know, not unusual at all for the agency to bear some of the costs of complying with those requirements, because that's central to the operation of the fishery. And also a third party doing it, right? Because the alternative would be to have, you know, a government person on every boat, which I would think the industry would want, would object to in theory, perhaps even more so than having a kind of third party who's more neutral and can observe and make sure that they're doing what they need to do, right? Yes, Your Honor. And I think it's important that, here, the vessel is subject to an observer requirement, but then they go out and procure the observer themselves. They engage the observer service provider directly. We, of course, will certify the observer services provider, train the observers, et cetera, so they meet our requirements for information collection, but they are the ones that go out and engage the observer. Anything further? Unless the court has any further questions, I think the court is time to end. For counsel, I mean, any questions by my colleagues? Thank you. All right, we'll hear from counsel for appellants. Thank you, Your Honor. I just want to make four points in rebuttal. First, Judge Walker was asking about the foreign fishery provision with counsel for appellee. And I think that is a very instructive provision, because it shows that Congress knew how to authorize industry to pay directly to monitors. It knew how to do it, and it gave it that authority in the foreign fishery. And so our point is that that provision, plus the other two programs, would be superfluous if the authority that the government claims under 1853b8 were as it is. So when Congress wanted to do the very specific thing that the government here does, the Congress has given a direct statutory authority. But Mr. Bolander, I guess this goes back to my question about whether what Congress was actually doing in the sections that you're talking about was just ratifying what a particular council and a particular region wanted. That it may well be that given all the controversy that you're talking about, we had, I can't even remember the name of it now. What was it? The North Pacific Council. There was a lot of concern about who's going to bear the cost and what this program is going to be. And so Congress ratified that. And so I don't know that we can take from that the kind of, you know, canon that you'd like us to impose to suggest that Congress's act in doing that meant that it was precluding any other council from making a similar decision. Because it ratified in that one circumstance, it necessarily means that it intended for nobody else to have the ability to make a determination about that. I think if, so there was some, I think, contention at the time that it's born in the history of whether or not North Pacific Fishery had that pre-existing authority. But if Congress intended to do that, to give this broad authority to all fisheries, then it would have done that. Instead, Congress responded to this controversy by only giving it to the North Pacific Fishery. And this is the exact same legislative enactment in 1990 that created Section V.A. You have evidence that the broader question was before Congress? Because you see, it just depends on how you, depends on how you frame this as to whether or not you're right. If the only thing before Congress at the moment it looked at this controversy was this controversy, and it was not being asked the broader question of whether and to what extent any council can make this determination, I'm back where I was before, which is they're ratifying this particular circumstance doesn't tell me what their intention was with respect to whether any other council could do this same thing. I, you know, I would submit, Your Honor, that at least three times since then, or indeed in H.R. 1554 in 1989, Congress did consider broad industry funding and declined to give it to the councils and to the government. So I do think this question has been before Congress several times, and I think that Congress's answer every time has been no. And so I just- No, no, no, no, no. I don't understand it. If Congress has a bill pending and doesn't enact it, that doesn't tell us anything. And the Supreme Court is clear about that. I think- You know, bills are proposed all the time. They even get out of committee, and they don't pass. Well, you know, interesting historically, but they don't have an impact. So that can't be your response to Judge Jackson. I think, Your Honor, it's just a piece of the evidence that goes to the greater statutory scheme. I think the fact that they enacted B8 and the North Pacific Fishery in the 1990 Fishery Conservation Amendments at the exact same time, one contained the ability to shift costs to industry, the other had silence, I think that speaks for itself. So, Your Honor, I don't believe we need to reach that legislative history. I think the text speaks for it. Just in answering Judge Jackson's question of whether Congress has considered this before, and it's been before Congress before, I think it certainly has. Well, considered. All right. Congress considers lots of things, but it doesn't mean they enact these proposals. That's what, I mean, isn't it Justice Scalia who made that point? So, any event. What about Judge Jackson's, what about Judge Jackson's reference to EPA and investigations and cost sharing and, you know, analogies in other, in the context of other agencies? Yeah, I think that's an important point. I hear what Judge Jackson is saying. I don't believe there's anything in the record or in the briefing that points to that. And I think that we have several. Now, for example, industry members are required to file audit reports. They're required to do all kinds of surveys. Government's not paying for that. But in order to indicate they're in compliance with these regionals, our national quality air standards, those are all imposed. So, you want to continue to operate, you have to provide records to the agency, studies, reports. That's, I thought, the reference that Judge Jackson may have had in mind. Yeah. And I think to kind of quote what Judge Walker was saying, there's a distinction between that and the inspector and the observer on the boat. I think Judge Walker called it weird. It's that the observer on the boat, the person who's actually demonstrating or taking into account your compliance on the boat has analogies. In the toxic dumping kind of scenario, I'm aware of cases in which there are observers on a boat after someone has been accused of that kind of dumping. And I don't know this for sure, but I wouldn't be surprised if there was some sort or shifting for those kinds of observers. So, that is not unusual, I think. Are you familiar with the closer context? I'm not aware of anything else. I don't know that it's in the briefing of where the inspectors and observers themselves have said cost shifting on the industry without a direct statutory authorization. I believe we cite a few cases where that's the case, where the Congress went to the great extent to grant that authority. So, no, I do think that the inspector and observer on the boat here is a unique situation. I think Congress treated it- Well, you say unique, but Judge Jackson's question is questioning that very broad statement. And you're saying you don't know the answer. I think we provide evidence in the briefing of other industries, including in the EPA, Clean Air Act, and Clean Water Act, where there are direct statutory authorization. Oh, of course. But Judge Jackson's question is going to- that's not necessarily dispositive of the issue here. And your argument is it's very unusual. And EPA counsel comes back and says, no, this is the usual thing that happens. And furthermore, as Judge Jackson's question emphasized, I thought, is a sharing of costs here. And there's no recovery of the government's costs from industry. So that's what we're getting at. I think, Your Honor, what's unusual here is shifting the costs onto industry without direct statutory authorization to do it in this issue. Yes, well, that's what we're trying to get you to focus on. It's done in other statutes. But I understand your point. I thought that's what Judge Walker was seeking from you. And by the way, can I just say that you've merged together whether this is an unusual situation, in fact, whether these kinds of having people on a boat and shifting the cost exists, and the question of whether or not there's statutory authority. And what I had understood, at least Judge Walker to be suggesting, is that if this is unusual, in fact, one might question whether there's statutory authority. And my point was, it's not unusual. In fact, I don't know what that says about the statutory authority, but this has happened in other industries and other circumstances in similar contexts. So I don't know how much we can take from that to illuminate our understanding of what Congress may have intended. I understand, Your Honor, and I think I'm not, I don't mean to conflate the authority to place observers with the authority to shift costs onto the industry. We're looking at the second question here, and that's the distinct question. And I think the, repeating myself, but the unusualness is that they're shifting. And I think it's if you look at the context of the statute. The unusualness is that they're shifting it without express statutory authority. That has to, that's your argument, right? That's correct, Your Honor. That's correct. And it's not unusual. And in the context of a statute where Congress gave direct statutory authority in three fisheries, I think Council Flora Powell Lee talked about that the fee programs allow the government to recover its costs, and I would call them cost-shifting programs. And here, Congress, it's not as if the observers couldn't be placed, if they couldn't shift funding onto the industry, it's that Congress would need to appropriate money in order to compensate this. So it doesn't defeat the purpose of the statute in order to shift costs onto industry. And I think that is Congress intended here. Can I just clarify one more thing, and I understand your time is short, but in order to make that statement unusual without direct statutory authority, don't we have to have before us other scenarios in which this very similar thing has happened and there is direct statutory authority? I just, I don't understand what you mean. It's unusual compared to what? I would have, to make that argument, I would have expected to see here are similar situations in which Congress has authorized observers, government people coming in and shifting the cost. And here is all the places where there's expressed statutory authority to do that. Without that, I don't know how you can say that it's unusual in this circumstance for costs to be shifted without statutory authority. I think there's two ways to look at that, one within the context of the statute and one which is more globally. And so within the context of the statute where they have these specific authorizations, I think it is unusual in contrast to the other three authorizations in the statute that would be superfluous otherwise. In the context globally, I think, first of all, I think the pertinence on the government to show they have the statutory authority here. And I am not aware of a situation perfectly analogous to the one we're dealing with here. And how do you deal with the government's point about this is not a situation where there were fees to be turned over to the government in the three examples you cite? You don't think that makes any difference, right? No, your honor. I think the government is finding fee. No, it doesn't make any difference or no. What's a different answer? Well, let me just explain myself so I make sure I'm clear. It's shifting costs onto industry. That's what these other three provisions require. Whether the government wants to call it a fee program or something else, it is shifting costs in the industry. That is the power that Congress delegated to the government in these three instances. And secondly, the fees don't go to government. Government is not recovering its costs. In the gut. So I would argue that the government's cost, the government is responsible for the cost of the IT monitors, of the observers, no matter what. So in my client's viewpoint, in our viewpoint, through the industry funded monitoring, the government is recovering costs for duties that it would otherwise have. And the statute is very specific as the only situations they can do that. Well, you know, maybe we'll figure out or technology will figure out a GPS, put on these boats, and that'll solve the problem. But I mean, there are distinctions here that have been recognized. So when you say it's unusual, that's what's troubling us. Not that you don't have some general arguments based on general principles, etc. That's all I'm getting at. We take I think we take your argument. Anything further? No, Your Honor. Thank you very much. We'll take the case under advisement.
judges: Rogers, Walker, Jackson